UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COREL CORPORATION and COREL, INC.,

        Plaintiffs,

v.                                                   Case No. 05-71130
                                                     Honorable Patrick J. Duggan
FORD MOTOR CO.,

        Defendant.
_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on March 15, 2006.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
           U.S. DISTRICT COURT JUDGE

This lawsuit arises from a contract between Micrografx, Inc., the predecessor of

Plaintiffs Corel Corporation and Corel, Inc. (collectively "Corel"), and Defendant Ford

Motor Co. ("Ford").  Corel asserts the following claims against Ford:  breach of contract

based on Ford's failure to purchase additional licenses from Corel (Count I); demand for

an accounting (Count II); unjust enrichment (Count III); copyright infringement (Count

IV); and breach of contract based on Ford's alleged failure to provide Corel with a one-

time list of Ford's suppliers (Count V).  Presently before the Court is Corel's motion for

partial summary judgment with respect to liability and Ford's motion for summary

judgment with respect to all of Corel's claims, both filed pursuant to Rule 56(c) of the

1

Federal Rules of Civil Procedure.  This Court held a hearing on the parties' motions on February 8, 2006.

## I.      Factual Background

Corel Corporation is a Canadian corporation with its principal place of business in Ontario, Canada.  Corel, Inc. is a Delaware corporation.  Corel is the surviving and successor corporation resulting from a series of mergers in October 2002 and March 2003, with the software company Micrografx, Inc. ("Micrografx").  Ford is a Delaware corporation.

On May 7, 1998, Ford and Micrografx entered into a "Platinum Preferred License Agreement" (the "Agreement"), pursuant to which Ford agreed to purchase certain software licenses from Micrografx.  *See* Corel's Mot. Att. A.  The Agreement provides that references to Ford include Ford's "Subsidiaries," which are defined as "a company in which, on a class by class basis, more than twenty percent (20%) of the stock entitled to vote for the election of directors is now or hereafter owned or controlled by [Ford] . . . but only (i) so long as such ownership and control exists and (ii) if the Subsidiary expressly agrees to assume all of the obligations th[e] Agreement imposes."[1] *See id.* ¶ 1(e).  The Agreement contains a choice of law provision stating that Michigan law controls.  *See id.* ¶ 13.

_____

[1] Exhibit E to the Fourth Amendment contains a list of the numerous companies in which Ford's stock ownership exceeded twenty percent.  *See* Corel Mot. Ex. 5 Att. B Ex. E.

2

Micrografx and Ford entered into four amendments to the Agreement. *See* Corel Mot. Att. 2-5. This lawsuit centers on the Fourth Amendment, dated December 29, 2000, which addressed Micrografx's "iGrafx FlowCharter 2000" software ("FlowCharter"). *See id*. Att. 5. According to the Fourth Amendment, Micrografx and Ford executed the amendment in response to Ford's request for "enterprise-wide license pricing" for FlowCharter. *See id*. Ex. B ¶ 1. Corel contends that this pricing system enabled Ford to use and deploy FlowCharter freely throughout its organization, including among the participating Subsidiaries listed in Exhibit BB to the Fourth Amendment,[2] without having to make an adjusted payment on the basis of the exact number of licenses displayed until the end of the term or upon specific events. *See* Corel Mot. Carraher Aff. ¶ 21; DiFrancesco Aff. ¶ 17.

The opening paragraph of Exhibit B to the Fourth Amendment provides that the agreement "is based on the understanding that Ford anticipates employing an estimated total of 21,000 Six Sigma participants by the end of 2004 and currently has 110,000 desktops on PC Renewal." *See* Corel Mot. Att. 5 Ex. B ¶ 1. Under "Pricing," the Fourth Amendment provides for 14,000 entity licenses of FlowCharter at a price of $1,910,000. *See id*. ¶ 4. Paragraph Four further provides for a rebate to Ford for 1800 units of a

---

[2]Exhibit BB to the Fourth Amendment lists the participating Ford entities at the time of the amendment, which were as follows: "Six Sigma Participants within PC Renewal"; "PC Renewal Participants as of the date of this Agreement"; Mazda Motor Corporation; Volvo Auto; Jaguar Limited; Aston Martin Limited; the Hertz Corporation; and Land Rover. *See* Corel Mot. Att. 5.

particular software previously purchased by Ford. *See id.* This Paragraph also sets forth the cost of a maintenance plan: twelve percent of the purchase price per year or $687,000 for three years of maintenance if purchased at the time of the initial order. *See id.*

This dispute centers on the terms of the enterprise license, which are set forth in Paragraph 6 of the Fourth Amendment. Paragraph 6 states, in relevant part:

> The following conditions apply to enterprise licenses:
>
> (i) *A maintenance plan must be maintained at all times. The maintenance plan cost is 12% annually of the cost of the licenses purchased under the enterprise agreement. If maintenance is not renewed, Ford, at the end of the contract will provide Micrografx a count of licenses (number and version). Ford will use reasonable best efforts to provide this information annually to Micrografx beginning December, 2001.
>
> (ii) A ratio of purchased Micrografx licenses to Windows® desktops of [sic] will be calculated for each entity in Exhibit BB at the renewal time of the entities [sic] maintenance plan with the exceptions listed below. If 20% of the Windows® desktops of the entity exceeds the number of entity licenses owned (14,000 licenses plus additions purchased), then the entity must purchase enough additional licenses to make up the difference. These licenses will be purchased at the rate of $128.00 per license.

*See id.* ¶ 6. Ford purchased 14,000 licenses initially and paid up front for three years of maintenance. The initial three-year maintenance plan expired on December 29, 2003.

On December 29, 2003, Ford chose not to renew its maintenance plan. As of October 2004, Ford and the entities listed in Exhibit BB to the Fourth Amendment had approximately 164,948 Windows desktops. *See* Corel Mot. Ex. 6. Contending that the

4

Fourth Amendment requires Ford to purchase additional licenses equal to the difference between 20% of the total number of Windows® desktops and the number of licenses already purchased by Ford (or 19,600), at $128 per license, Corel sent an invoice to Ford for $2,508,800.  Ford refuses to pay this amount, claiming that it is not required to pay for additional licenses under the agreement.

## II.     Subject Matter Jurisdiction

Corel contends that this Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1338, based on its allegation of copyright infringement.[3]  According to Corel, Ford is infringing Corel's copyright by reproducing and using the FlowCharter software on its desktops without a valid license to do so.  *See* Compl. ¶ 49.

In footnote one to its motion for summary judgment, Ford contends that the Court lacks subject matter jurisdiction because Corel's lawsuit is premised on its contract with Ford and Ford's alleged breach of that contract, rather than any violation of Corel's copyright.  *See* Ford's Mot. at 2 n.1.  In other words, Ford argues that Corel's claim is not that Ford unlawfully copied its software, but rather that Ford has refused to purchase additional licenses based on the number of its Windows® desktops.  In response to Ford's motion, Corel contends that the Court has subject matter jurisdiction because Corel sufficiently asserted a claim of copyright infringement in Paragraph 49 of its complaint. *See* Corel Resp. ¶¶ 14-16.

_____

[3]As indicated previously, there is no diversity of citizenship among the parties.

5

Parties cannot consent to subject matter jurisdiction where it is lacking, nor can they waive it. *Alongi v. Ford Motor Co.*, 386 F.3d 716, 728 (6th Cir. 2004). "The existence of subject matter jurisdiction may be raised at any time, by any party, or even *sua sponte* by the court itself." *In re Lewis*, 398 F.3d 735, 739 (6th Cir. 2005). The Court must determine whether subject matter jurisdiction exists before making any decision on the merits. *Moir v. Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). When the defendant "facially attacks" the court's subject matter jurisdiction by challenging the sufficiency of the pleadings, the court must assume that the allegations in the complaint are true. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). Where the defendant brings a "factual attack" on subject matter jurisdiction, however, no presumption of truth applies to the allegations contained in the pleadings and the court may consider other documentary evidence in conducting its review. *Id.*

For whatever reason, Ford has not filed a separate motion to dismiss for lack of subject matter jurisdiction. Based on Ford's limited argument with respect to subject matter jurisdiction tacked on to its motion for summary judgment, the Court presumes that Ford is asking the Court to look beyond the pleadings to assess its jurisdiction over Corel's claims because, on its face, Corel's complaint sufficiently pleads a claim based on federal copyright law and therefore invokes this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1338. Based on the evidence before it, the Court finds that it has subject matter jurisdiction.

The Agreement grants Ford a perpetual license to use the FlowCharter software it

6

purchases.  Ford, however, must purchase a license for each desktop station on which the
software is copied and used.  As the Agreement provides, Ford must provide periodic
reports documenting the number of copies of FlowCharter purchased *or downloaded* and
pay a license fee for each copy.  *See* Corel Mot. Att. 1 ¶ 2 & Ex. C ¶ 1 ("End User
Agreement")(emphasis added).  If Ford's use of the FlowCharter software exceeds its
license in that Ford has copied the software on more desktops than it has paid a license
fee, it appears to the Court that Corel may be able to establish its copyright infringement
claim.  Thus the Court concludes that it has subject matter jurisdiction over this dispute.

## III.  Standard for Summary Judgment

Pursuant to Rule 56(c), "summary judgment is proper 'if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with affidavits, if
any, show that there is no genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317,
322, 106 S. Ct. 2548, 2552 (1986)(quoting FED. R. CIV. P.  56(c)).  "Rule 56(c) mandates
summary judgment . . . against a party who fails to make a sufficient showing to establish
the existence of an element essential to that party's case, and on which that party bears the
burden of proof at trial."  *Id.*

Where the non-moving party would have the burden of proof at trial, the moving
party ". . . bears the initial responsibility of informing the district court of the basis for its
motion, and identifying those portions of 'the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any,' which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See id.*; *see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). "[T]he nonmoving party must go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553. To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986).

## IV.    Arguments

Corel contends that Paragraph 6(ii) of the Fourth Amendment unambiguously required Ford to "true up" with Corel when Ford failed to renew its maintenance contract. As Corel explains, twenty percent of Ford's Windows® desktops exceeded the number of licenses Ford purchased and therefore the Fourth Amendment obligated Ford to purchase enough additional licenses at $128 per license to make up the difference. The only unresolved factual issue, Corel maintains, is the exact number of Ford's Windows® desktops.

According to Ford, the plain language of the Fourth Amendment only requires the individual entities listed in Exhibit BB to purchase additional licenses *if* the entity renews

8

its maintenance contract.  Because there is no dispute that the maintenance contract was

not renewed, Ford argues that no additional licenses had to be purchased and that it

therefore is entitled to summary judgment.  Ford further argues that it is entitled to

summary judgment because, according to Ford, Paragraph 6(ii) undisputedly does not

require *Ford* to purchase any additional licenses.  Instead, Ford contends, the paragraph's

plain language at most requires *each entity* in Exhibit BB to the Fourth Amendment to

purchase additional licenses at the renewal time "if 20% of the Windows desktops **of the**

**entity** exceeds the number of entity licenses owned . . ."  *See* Ford Mot. at 9-10 (emphasis

added by Ford).  As counsel for Ford stated at the hearing, this is a "prospective

obligation."  Stated differently, Ford argues that twenty percent *of each entity's* desktops

must exceed the number of licenses owned by that entity to trigger the requirement that

additional licenses be purchased (and again, Ford argues that this obligation only arises if

maintenance is renewed).  *See id*.  Alternatively, Ford contends that the contract is

ambiguous such that the trier of fact must decide the relevant parties' intent from the

available relevant evidence.

## V.      Applicable Law and Analysis

Under Michigan law, "[t]he proper interpretation of a contract is a question of

law." *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 47, 664 N.W.2d 776 (Mich.

2003)(citing *Archambo v. Lawyers Title ins. Corp.*, 466 Mich. 402, 408, 646 N.W.2d 170

(2002)).  "'The cardinal rule in the interpretation of contracts is to ascertain the intention

of the parties . . .'" *City of Grosse Pointe Park v. Mich. Municipal Liability and Property

Pool*, 473 Mich. 188, 198, 702 N.W.2d 106 (2005)(quoting *McIntosh v. Groomes*, 227

Mich. 215, 218, 198 N.W. 954 (1924)).  The court must examine the language in the

contract, "giving it its ordinary and plain meaning if such would be apparent to a reader

of the instrument." *Wilkie*, 469 Mich. 41, 664 N.W.2d 776 (citing *Bianchi v. Auto. Club

of Mich.*, 437 Mich. 65, 71 n.1, 467 N.W.2d 17 (1991)).  The court must read the contract

as a whole, "giv[ing] effect to every word, phrase, and clause . . . and avoid[ing] an

interpretation that would render any part of the contract surplusage or nugatory." *Klapp

v. United Ins. Group Agency*, 468 Mich. 459, 468, 663 N.W.2d 447 (2003).  "'If the

language of the contract is clear and unambiguous, it is to be construed according to its

plain sense and meaning . . .'" *City of Grosse Pointe Park*, 473 Mich. at 198, 702

N.W.2d 106 (quoting *New Amsterdam Cas. Co. v. Sokolowski*, 374 Mich. 340, 342, 132

N.W.2d 66 (1965)).

If the court concludes that an ambiguity exists in the contract, its meaning is a

question of fact that must be decided by the jury.  *Klapp*, 468 Mich. at 469, 663 N.W.2d

447 (citing *Hewett Grocery Co. Biddle Purchasing Co.*, 289 Mich. 225, 236, 286 N.W.2d

10

221 (1939)).  As the Michigan Supreme Court explained:

> "Where a contract is to be construed by its terms alone, it is
> the duty of the court to interpret it; but where its meaning is
> obscure and its construction depends upon other and extrinsic
> facts in connection with what is written, the question of
> interpretation should be submitted to the jury under proper
> instructions."

*Id*. (quoting *O'Connor v. March Automatic Irrigation Co.*, 242 Mich. 204, 210, 242

N.W.2d 784 (1928)).

Applying these rules of contract interpretation to the present case, the Court finds

the language of Paragraph 6(ii) ambiguous as a result of Ford's and Micrografx's use of

"at the renewal time of the entities [sic] maintenance plan" to indicate when the

obligation to "true up" arises.  On one hand the provision may require Ford or one of the

entities listed in Exhibit BB to the Fourth Amendment to "true up" simply when it is time

for Ford or an entity to renew its maintenance plan.  On the other hand, the provision only

may require Ford or one of the entities to "true up" if it renews its maintenance plan.  The

Court believes that extrinsic evidence is necessary to ascertain Ford's and Micrografx's

intent at the time they executed this provision.  According to Michigan law, the meaning

of Paragraph 6(ii) therefore is a jury question requiring denial of Corel's motion for

partial summary judgment.

The Court agrees with Ford, however, that the calculation set forth in Paragraph

6(ii) to determine whether additional licenses must be purchased is based on twenty

percent of the desktops *of each entity* listed in Exhibit BB to the Fourth Amendment,

rather than an aggregate of the desktops of all of the entities.  As the provision plainly states, "[a] ratio of purchased Micrografx licenses to Windows® desktops of [sic] will be calculated *for each entity in Exhibit BB . . .*"  *See* Corel Mot. Att. 5 Ex. B ¶ 6(ii)(emphasis added).  The provision further provides that additional licenses only need to be purchased to make up the difference between "20% of the desktops *of the entity*" and the "number of entity licenses owned . . ."  *See id.* (emphasis added).

Corel's claim that additional licenses must be purchased is based on the total number of desktops for all the entities listed on Exhibit BB, rather than for each entity. *See* Corel Mot. Att. 6.  The Court still finds that Ford is not entitled to summary judgment, however, because the Court cannot conclude based on the language of the contract and the evidence presented in support of the parties' motions that no "entity" listed on Exhibit BB has a sufficient number of desktops to require a "true up" if Corel is correct that Paragraph 6(ii) requires a "true up" absent an entity's renewal of its maintenance plan.  As Corel's counsel pointed out at the motion hearing, one "entity" listed on Exhibit BB is the "Six Sigma Participants in PC Renewal" and 20% of the total desktops of that entity exceeds 14,000.

As Ford points out, Paragraph 6(ii) also states unequivocally that if twenty percent of the entity's desktops exceed the number of entity licenses owned, "then the *entity* must purchase enough additional licenses to make up the difference."  *See id.* (emphasis added).  Ford argues that it is entitled to summary judgment because the plain language of Paragraph 6(ii) does not require *it* to purchase additional licenses.  Ford compares this

12

provision which fails to refer to Ford by name to the preceding subsection, Paragraph 6(i), which specifically requires Ford to take certain actions if maintenance is not renewed– i.e. to provide Micrografx a count of licenses deployed by version. *See* Corel Mot. Att. 5 Ex. B ¶ 6(i).

The Court agrees with Ford that the plain language of Paragraph 6(ii) only obligates each particular entity listed on Exhibit BB to "true up" if twenty percent of that entity's desktops exceeds the total licenses purchased. However it is not clear to the Court whether Ford is the entity, is included in the entity, or is liable for the entity referred to in Exhibit BB as the "Six Sigma Participants in PC Renewal." Moreover, Ford is not exempt from the obligation to "true up" if twenty percent of its desktops exceeds the licenses purchased and neither party has informed the Court as to the number of Ford's desktops at the "renewal time." Thus the Court concludes that Ford is not entitled to summary judgment at this time with respect to Corel's first breach of contract claim and claim demanding an accounting.

The Court further concludes that Ford is not entitled to summary judgment with respect to Corel's copyright infringement claim or breach of contract claim based on Ford's alleged failure to provide a one-time list of suppliers to Corel pursuant to Paragraph 3 of Exhibit B to the Fourth Amendment. The Court notes that Ford did not present any arguments in its motion to support its request for summary judgment with respect to these claims.

Accordingly,

13

**IT IS ORDERED**, that Plaintiffs' Motion for Summary Judgment as to Liability is **DENIED**;

**IT IS FURTHER ORDERED**, that Defendant's Motion for Summary Judgment is **DENIED**.


s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Robert F. Riley, Esq.
Francis R. Ortiz, Esq.

14